## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**OKULA MUHAMMAD**

**Plaintiff,**

v.

**CORNERSTONE CHEMICAL COMPANY
and GREG RITTER**

**Defendants.**

**CIVIL NO. 2:21-CV-435**

## COMPLAINT

Plaintiff Okula Muhammad asserts his causes of action against defendants Cornerstone Chemical Company and Greg Ritter as follows:

### THE PARTIES

1.      Plaintiff is Okula Muhammad, a person of majority, who is a citizen of Louisiana and a resident of Orleans Parish.

2.      Defendant is Cornerstone Chemical Company ("Cornerstone"), a foreign business corporation domiciled and organized in Delaware but headquartered, registered, and actively doing business in Louisiana, with its principal place of business located in Jefferson Parish.

3.      Defendant is Greg Ritter, a person of age and majority, who upon information and belief, is a citizen and resident of Louisiana.

### JURISDICTION AND VENUE

4.      The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question); 42 U.S.C. §§ 2000e-2 *et seq*. (Title VII); 2000e-3 *et seq*. (Title VII's anti-retaliation provision); and 42 U.S.C. § 1981 *et seq*. (discrimination in contracts based on race and retaliation) as more particularly set-out herein.

5.      The Court has supplemental, subject-matter jurisdiction over Mr. Muhammad's Louisiana state law claims pursuant to 28 U.S.C. § 1367(a) because the state-law claims are so related to his federal law claims that they form part of the same case or controversy as more particularly set-out herein.

6.      The Court has personal jurisdiction over Cornerstone because it is a corporation registered and actively doing business in Louisiana, and, through its registered agent for the service of process, is present within Louisiana at the time this suit commenced.

7.      The Court has personal jurisdiction over Greg Ritter because, upon information and belief, he is a Louisiana citizen and physically present within Louisiana at the time this lawsuit commenced.

8.      Alternatively, the Court has personal jurisdiction over Greg Ritter as he committed the unlawful employment acts giving rise to this case while physically present in Louisiana, and thus has established minimum specific contacts with Louisiana, arising from the facts of this case, comporting with the requirements of fair play, substantial justice, and the Fourteenth Amendment of the Constitution of the United States.

9.      Venue for Mr. Muhammad's Title VII claims is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) because the alleged discriminatory employment practices occurred within this forum (specifically Jefferson Parish), and Mr. Muhammad would have continued to be employed in this forum but for his discriminatory termination (same), and upon information and belief the employment records relevant to this action are found within this judicial district (same).

10.     Venue for Mr. Muhammad's Section 1981 and supplemental state-law claims is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Mr. Ritter (the individual defendant) actually resides in this forum and Cornerstone (the company-entity defendant) is susceptible to

this Court's personal jurisdiction in this forum.

11.     Alternatively, venue for Mr. Muhammad's Section 1981 and supplemental state-law claims are proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because all defendants' unlawful acts, as well as Mr. Muhammad's resulting injuries and damages, giving rise to this lawsuit occurred within this judicial district (specifically, Jefferson Parish) and, accordingly, a substantial part of the events or omissions giving rise to the claims asserted in this lawsuit occurred in this judicial district.

## PROCEDURAL AND STATUTORY ALLEGATIONS

12.     At all relevant times, Cornerstone employed more than 500 employees.

13.     In 2014, Cornerstone hired Mr. Muhammad (black) as a Reactor Operator.

14.     Mr. Muhammad had been continuously employed by Cornerstone since that time and assigned to Cornerstone's chemical plant located at 10800 River Road, Westwego, LA 70094.

15.     Upon information and belief, at all times relevant to the facts of this matter, Greg Ritter was the final decision maker with authority to discipline and terminate Mr. Muhammad's employment.

16.     On approximately December 18, 2018, Mr. Muhammad was terminated by Greg Ritter for the first time.

17.     Mr. Muhammad appealed his first termination through his union.

18.     Cornerstone reinstated Mr. Muhammad's employment effective on or about December 2, 2019.

19.     On April 30, 2020, less than five months after Mr. Muhammad was reinstated, Greg Ritter terminated Mr. Muhammad's employment a second time.

20.     On or about November 11, 2020, within 300 days of his second termination and last adverse

3

employment action, Mr. Muhammad timely filed an EEOC Charge of Discrimination with the EEOC New Orleans Field Office (which, because of work-sharing agreement with the Louisiana Commission on Human Rights, was automatically accepted for filing with the LCHR, terminated, and referred to the EEOC for processing) alleging that Cornerstone unlawfully discriminated against and terminated Mr. Muhammad based on his race, color, and in retaliation for his prior, protected complaints regarding race-based discrimination in violation of Title VII of the Civil Rights Act of 1964 (EEOC Charge No. 461-2021-00307).

21.     On or about December 4, 2020, the EEOC issued Mr. Muhammad a Notice of Right to Sue in this matter.

22.     Mr. Muhammad timely filed this complaint within 90 days of receiving the EEOC's Notice of Right to Sue letter.

## FACTS

**A.     The Plaintiff – Okula Muhammad**

23.     Okula Muhammad is a 51-year-old black, African American man who lives in New Orleans, Louisiana.  Mr. Muhammad is married and has one minor child.

24.     Mr. Muhammad began his full-time career with Cornerstone as a Centrifuge Operator in 2014, and later was promoted to Reactor Operator.

25.     Through excellent work and dedication to service, prior to his first termination, Mr. Muhammad had never received formal discipline, warnings, or complaints.

26.     In fact, Mr. Muhammad was rated the 5th Safest Employee by Cornerstone administration just prior to his first termination.

27.     Despite this, Mr. Muhammad was terminated by Cornerstone on or about April 30, 2020.

28.     Today, after a length of unemployment, Mr. Muhammad is currently employed by a

maritime company as a deck hand on a barge.

29.     This replacement job is extraordinarily, physically taxing on Mr. Muhammad, and pays far less than his prior employment with Cornerstone, but Mr. Muhammad accepted the position to make ends-meet and support himself and his family.

**B.      The Defendants – Cornerstone Chemical Company & Greg Ritter**

30.     Cornerstone Chemical Company is a Delaware business corporation formed in November 2010.

31.     At all relevant times, upon information and belief, Cornerstone employed more than 500 employees.

32.     Upon information and belief, Cornerstone is in the business of producing industrial chemicals such as acrylonitrile, melamine, sulfuric acid, urea, and others for commercial sale at its chemical plant, known as the Cornerstone Energy Park, in Waggaman, Louisiana.

33.     Upon information and belief, Cornerstone's corporate office and headquarters is located in Metairie, Louisiana and its only chemical plant, the Cornerstone Energy Park, is located in Waggaman, Louisiana, both locations within Jefferson Parish, Louisiana.

34.     Upon information and belief, a significant percentage of Cornerstone's employees assigned to its chemical plant are Black or African American, yet there is only one Black or African American employee assigned to a management position, resulting in a statistical, disproportionately underrepresented number of Cornerstone's Black or African American employees assigned to management positions.

35.     At all relevant times in this case, Greg Ritter was the plant superintendent of Cornerstone Energy park.

36.     At all relevant times in this case, upon information and belief, Greg Ritter was the ultimate

decision maker who decided to terminate Mr. Muhammad's employment with Cornerstone.

**C.     Mr. Muhammad was a Model Cornerstone Employee**

37.     Since his original hire in 2014, Mr. Muhammad was assigned as a Reactor Operator at the Cornerstone Energy Park.

38.     Upon information and belief, Mr. Muhammad was an objectively model employee.

39.     Prior to his first termination, Mr. Muhammad had never received discipline, warnings, or adverse management action of any kind.

40.     Prior to his first termination, Cornerstone rated Mr. Muhammad as the 5th Safest Employee by record out of all employees at the Cornerstone Energy Park.

41.     At all relevant times during this case, Mr. Muhammad's ultimate decision-maker was Cornerstone's plant superintendent, Greg Ritter (white); Cornerstone's assistant plant superintendent was Tina Nguyen (Vietnamese); and Mr. Muhammad's immediate supervisor was Gerald Rome (white).

**D.     Cornerstone and Greg Ritter Terminate Mr. Muhammad for the First Time**

42.     On approximately December 18, 2018, Cornerstone through its superintendent Greg Ritter terminated Mr. Muhammad's employment.

43.     Mr. Ritter alleged that the termination was based on Mr. Muhammad's failure to appropriately setup for cleaning and maintenance a piece of equipment known as the Mist Eliminator 100 ("ME100").

44.     Upon information and belief, the ME100 is a piece of equipment, the general type of which is commonly known as a vapor-liquid separator or demister, used to separate vapor-liquid mixtures into their constituent phases, for example into vapor versus condensed, liquid chemicals (that are then further treated and produced, or further treated, and disposed of as waste).

45.     At Cornerstone's Energy Park, at least some of the vapor flow that passes through the ME100 contains hazardous or deadly chemicals such as Hydrogen Cyanide.

46.     Accordingly, upon information and belief, appropriate setup, use, and maintenance of the ME100 at Cornerstone Energy Park is important for the safety of plant workers and also environmental quality.

47.     Because Mr. Muhammad was not physically present at the ME100 at the time in question of Mr. Ritter's allegations against him, it was factually impossible that Mr. Muhammed failed to correctly setup for cleaning and maintenance the ME100, and upon information and belief Mr. Ritter knew this.

48.     Upon information and belief, the employee who was responsible for the safety and environmental violations alleged by Mr. Ritter regarding the ME100 was a fellow employee named R.J. (white) (last name unknown).

49.     Upon information and belief, Mr. Muhammad's direct supervisor, Gerald Rome, also knew that Mr. Muhammad could not have been responsible for the ME100 incident.

50.     Upon information and belief, Gerald Rome was the person who first fabricated the allegations against Mr. Muhammad and brought the fabricated allegations to Greg Ritter's attention.

51.     Upon information and belief, Gerald Rome fabricated the allegations against Mr. Muhammad, and Greg Ritter used the fabricated allegations as pretext to terminate Mr. Muhammad despite his knowledge that the allegations were false, because both men held race-based animus against Mr. Muhammad.

52.     Alternatively and additionally, upon information and belief, Gerald Rome fabricated the ME100 allegations against Mr. Muhammad, and Greg Ritter used the fabricated allegations as

pretext to terminate Mr. Muhammad despite his knowledge that the allegations were false, because both men held race-based preference towards R.J. and terminated Mr. Muhammad to protect R.J. based on that race-based favoritism.

53.     Upon information and belief, and despite knowing the truth of the matter, Cornerstone and Greg Ritter never investigated or took action against R.J. or any other responsible employee related to the ME100 incident.

54.     Upon information and belief, even after the eventual arbitrator in Mr. Muhammad's union grievance made the factual determination that Mr. Muhammad could not have been the one to improperly set up, use, or maintain the ME100, Cornerstone and Greg Ritter never investigated nor took action against R.J. or any other responsible employee for the violation.

**E.      Mr. Muhammad Appeals his Termination through his Union**

55.     Soon after his termination, Mr. Muhammad complained about and appealed Cornerstone's termination decision through his union grievance and complaint process.

56.     Mr. Muhammad's complaint eventually went to arbitration and was decided by an arbitrator.

57.     While the arbitration was pending in 2019, Mr. Muhammad also made formal complaints within the arbitration proceedings and to Cornerstone's Human Resources department alleging that Gerald Rome and Greg Ritter had terminated his employment because of race-based animus against him.

58.     The HR representative Mr. Muhammad spoke with assured him that there would be an investigation into the allegations of race-based discrimination.

59.     However, upon information and belief, Cornerstone never investigated nor took any action based on Mr. Muhammad's complaints, even after his reinstatement.

60.     During the arbitration hearing on Mr. Muhammad's complaint, Greg Ritter attended as a Cornerstone representative.

63.     Upon information and belief, during the arbitration hearing, Mr. Muhammad also alleged that management's termination decision was based on race-based animus against Mr. Muhammad.

64.     Upon information and belief, the arbitrator ruled in Mr. Muhammad's favor, specifically finding that he could not have been responsible for the ME100 incident, and the arbitrator ordered Cornerstone to reinstate Mr. Muhammad's employment.

61.     Upon information and belief, Cornerstone management were embarrassed by the result of the arbitration hearing, and thereafter further held retaliatory animus against Mr. Muhammad because he had alleged management's decision to terminate him was based on race-based animus.

**F.     Mr. Muhammad is Reinstated and Returns to Cornerstone**

62.     Cornerstone reinstated Mr. Muhammad to his prior position of Reactor Operator at Cornerstone Energy Park, and Mr. Muhammad returned to work on or about December 2, 2019, almost a year after his original termination on December 18, 2018.

63.     After his reinstatement, Greg Ritter remained plant superintendent and Mr. Muhammad's ultimate decision-maker.

64.     After his reinstatement, Mr. Muhammad's new immediate, supervisor was Stead Palahan (white).

65.     Upon information and belief, Cornerstone maintains a policy that after any significant leave of absence, an employee must retrain in their position before assuming the responsibilities of Reactor Operator.

66.     Upon information and belief, the typical training period mandated by Cornerstone for one of its Reactor Operators is between five and seven months.

67.     Upon information and belief, Greg Ritter violated Cornerstone policy and ended Mr. Muhammad's training period after only approximately three or more weeks.

68.     Upon information and belief, Greg Ritter ended Mr. Muhammad's retraining period early for the purpose of later terminating Mr. Muhammad for pretextual cause.

69.     Ultimately, however, upon information and belief, other members of Cornerstone's management intervened and allowed Mr. Muhammad to receiving further training for a short, additional period of time.

70.     However, upon information and belief, management still required Mr. Muhammad to resume his normal job responsibilities as a Reactor Operator faster than what Cornerstone's alleged training policy allowed.

71.     Mr. Muhammad began to worry that Mr. Ritter might attempt to pretextually terminated his employment again, and so Mr. Muhammad contacted Cornerstone human resources to inquire about the status of their investigation into his racial discrimination complaints against Ritter.

72.     Human resources informed Mr. Muhammad that Cornerstone had completed its investigation and determined management had not engaged in race-based discrimination against Mr. Muhammad.

73.     Upon information and belief, human resources did not actually conduct any investigation into Mr. Muhammad's complaints.

74.     Shortly thereafter, when Mr. Muhammad resumed his duties as a Reactor Operator in early in 2020, Mr. Ritter ordered Mr. Muhammad to prepare the ME100 for cleaning and servicing.

75.     Mr. Muhammad followed Mr. Ritter's instructions, relocated to the ME100, and inspected it.

76.     Mr. Muhammad discovered several issues with the equipment.

77.     First, Mr. Muhammad discovered what he perceived as a likely hazardous chemical improperly collected and trapped in a drainage pipe attached to the ME100, which eventually could discharge untreated into the air or the plant's drainage trough.

78.     Second, Mr. Muhammad perceived that the ME100 drainage valves had been aligned incorrectly, likely causing the hazardous chemical to collect in the ME100 drainage pipe.

79.     Mr. Muhammad immediately emailed Greg Ritter, Tina Nguyen, and Stead Palahan, about the hazardous conditions Mr. Muhammad perceived with the ME100.

80.     Relatedly, Mr. Muhammad had previously complained to Greg Ritter and others since his reinstatement that the plant's open air waste trough in which chemicals from the ME100 and other units are mixed with water to dilute them to safe levels allowed, to Mr. Muhammad's perception, the risk that dangerous chemical vapor could escape the trough or for chemical to splash out. Likewise, Mr. Muhammad had previously complained to Greg Ritter and others that Cornerstone's procedure for setting up the ME100 for cleaning and servicing involved placing a used, wet, burlap sack over the exit port of the ME100 drainage pipe, ostensibly to control the amount of hazardous chemical vapor that escaped into the air, but which Mr. Muhammad reasonably believed did not adequately protect workers.

81.     At the time Mr. Muhammad contacted Cornerstone management regarding each of these issues, he reasonably and in good-faith believed that the current state of the ME100 constituted violations of Cornerstone safety policy and, given the nature of the safety issues, likewise violated state and federal occupational health and safety and environmental laws or regulations.

82.     In his email to management, Mr. Muhammad also requested a supervisor be assigned to assist in the inspection and maintenance of the ME100 to ensure safety and that Mr. Muhammad could not be blamed for what he perceived as the pre-existing, hazardous condition of the

11

equipment.

83.     Upon information and belief, Mr. Muhammad later came to understand that the employee allegedly responsible for leaving the ME100 in the hazardous state in which Mr. Muhammad discovered it was a man named M.Z. (white) [1]

84.     Upon information and belief, Cornerstone management, including Mr. Ritter, knew that M.Z. was responsible for the condition of the ME100, but did nothing to further investigate the matter or discipline M.Z.

85.     On April 30, 2020, only a short while after Mr. Muhammad contacted management regarding the hazardous condition the ME100, Greg Ritter terminated Mr. Muhammad for the second time.

86.     Upon information and belief, Mr. Ritter ordered assistant plant superintendent Tina Nguyen to inform Mr. Muhammad of his termination.  During Mr. Muhammad's meeting with Ms. Nguyen, she indicated that the termination decision was based on Mr. Muhammad's violation of safety procedures by failing to improperly set up for cleaning and maintenance the ME100 during this second incident.

87.     Upon information and belief, this was once again mere pretext, and Mr. Ritter actually terminated Mr. Muhammad based on his race-based animus against him.

88.     Alternatively, upon information and belief, the reason Mr. Ritter pretextually terminated Mr. Muhammad this second time was in retaliation against him based on his prior, protected complaints of race-based discrimination to both Cornerstone Human Resources and during Mr. Muhammad's prior arbitration proceedings.

---

[1] Plaintiff refers to witnesses in this matter using only their initials to protect their privacy in this publicly filed document. Plaintiff will supplement with the full name of each witness during discovery.

89.     Alternatively, upon information and belief, the reason Mr. Ritter pretextually terminated Mr. Muhammad this second time was in retaliation against him because of his prior protected complaints – which Mr. Muhammad reasonably and in good-faith believed alleged violations of state or federal safety and environmental laws or regulations – concerning Cornerstone's practices regarding the ME100 and associated hazardous chemical contamination, open air troughs, and the use of a burlap sack to control chemical vapor discharge were unsafe.

90.     Upon information and belief, at all times Mr. Ritter engaged in the unlawful employment actions against Mr. Muhammad, including terminating his employment, in the full course and scope of his employment with Cornerstone, acting as Cornerstone's authorized agent, and with the knowledge that his employment actions violated both state and federal law.

**G.     The Aftermath**

91.     As a result of his discriminatory and retaliatory termination, Mr. Muhammad lost his employment, pay, benefits, and only source of income.

92.     As a result of his discriminatory and retaliatory termination, Mr. Muhammad is out significant lost back and future wages.

93.     As a result of his discriminatory and retaliatory termination, Mr. Muhammad has suffered non-compensatory damages including damages for stress, loss of enjoyment of life, and mental anguish, including the significant disruption to his family and personal life.

94.     As a result of his discriminatory and retaliatory termination, Mr. Muhammad has been forced to accept replacement employment as a deck hand for a maritime transportation company, for significantly less pay and benefits compared to his former employment, and which has caused Mr. Muhammad significant physical pain and injury.

95.     As a result of his discriminatory and retaliatory termination, Mr. Muhammad has suffered

significant out of pocket expenses and has incurred attorney's fees and costs in this litigation.

## CAUSES OF ACTION

**A.     Unlawful Disparate-Treatment Discrimination Based on Race and Color Under Title VII**

96.     Mr. Muhammad states a cause of action for unlawful disparate-treatment discrimination based on his race (African American) and color (black) against Cornerstone under Title VII.

97.     Title VII of the Civil Rights Act of 1964 (as amended) forbids an employer from discriminating against any employee on account of the person's race or color.  42 U.S.C. §2000e-2(a)(1).  An employer illegally discharges an employee based on his race or color when race or color is at least one of the factors motivating the discharge.  *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005); *cf* 42 U.S.C. § 2000e–2(m) (codifying that an employee proves unlawful discrimination when a protected status "was a motivating factor for any employment practice, even though other factors also motivated the practice").   When direct evidence of discrimination is not available, an employee may prove his case with circumstantial evidence that he "(1) is a member of a protected class; (2) was qualified for the position; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class, or in the case of disparate treatment, shows that other similarly situated employees [not in the protected class] were treated more favorably." *Bryan v. McKinsey & Co.,* 375 F.3d 358, 360 (5th Cir. 2004).

98.     Alternatively, "[s]tatistical evidence is also of central importance in a disparate treatment case[,]" and an employee may prove his prima facie case statistically "if gross statistical disparities in the composition of an employer's work force can be shown."  *Pouncy v. Prudential Ins. Co. of Am.*, 668 F.2d 795, 802 (5th Cir. 1982).  Specifically, when "the statistical showing is sufficiently strong in a disparate treatment action, [an employee's] prima facie case can be made without

additional evidence establishing that defendant purposefully treated minorities protected under Title VII less favorably than other persons." *Id.* "If statistical evidence is insufficient to establish discriminatory intent, [employees] may bolster their case by introducing historical, individual, or circumstantial evidence." *Anderson v. Douglas & Lomason Co., Inc.*, 26 F.3d 1277, 1285 (5th Cir. 1994).

99.    Finally, in a Title VII action, an employer is vicariously liable for its manager's discriminatory acts when the manager serves as the employer's agent, or when the employer knew or should have known of the manager's discriminatory conduct and took no remedial action. *See e.g.*, *Flanagan v. Aaron E. Henry Cmty. Health Servs. Ctr.*, 876 F.2d 1231, 1235 (5th Cir. 1989).

100.    In this case, Mr. Muhammad had enjoyed great success at Cornerstone prior his first termination in 2018.    Prior to that termination, Mr. Muhammad had never received formal discipline or admonishment, and, just prior to his first termination, Mr. Muhammad was rated the 5th Safest Employee by record at Cornerstone' chemical plant.    Upon information and belief, Cornerstone management terminated Mr. Muhammad's employment in December 2018 based on the race-based animus of plant superintendent Greg Ritter and supervisor Gerald Rome, or alternatively their race-based preference for Mr. Muhammad's white, comparator employee, R.J., who upon information and belief was actually responsible for the safety and environmental misconduct regarding the ME100 unit.

101.    Mr. Muhammad successfully appealed Cornerstone and Mr. Ritter's original termination decision through his union, and the arbitrator ruled in Mr. Muhammad's favor and order Cornerstone to reinstate his employment.    Upon information and belief, Cornerstone management and specifically Greg Ritter then held further, retaliatory animus against Mr. Muhammad because of his prior complaints of race-based discrimination made to both Cornerstone human resources

and during Mr. Muhammad's arbitration proceedings.

102.   Cornerstone reinstated Mr. Muhammad's employment as a Reactor Operator at its Cornerstone Energy Park on or about December 2, 2019.   Upon information and belief, Cornerstone management and Greg Ritter again acted on their race-based and retaliatory animus against Mr. Muhammad, first by attempting to early terminate his mandatory retraining period as a Reactor Operator before he would have ordinarily been assigned to regular duties; and, second, by once again ginning up a pretextual accusation that Mr. Muhammad did not safely set up, use, or maintain the ME100 unit.

103.   On April 30, 2020, Cornerstone and Greg Ritter terminated Mr. Muhammad's employment for a second time and for what appears to be the identical, pretextual reason for Mr. Muhammad's first termination: unsafely setting up, using, or maintaining the ME100 unit.   Upon information and belief, Cornerstone management and Greg Ritter's actually terminated Mr. Muhammad's employment this second time because of the same race-based animus that motivated Mr. Muhammad's first termination.   In other words, but-for Mr. Muhammad's race (African American) and color (Black), he would not have been terminated.

104.   Further, upon information and belief, during both ME100 incidents, Cornerstone and Greg Ritter did not investigate the allegedly white, comparator employees who were allegedly responsible for the unsafe use and misconduct surrounding the ME100 unit.   Upon information and belief, Cornerstone and Mr. Ritter specifically, pretextually terminated Mr. Muhammad's employment to protect these white, comparator employees from discipline.

105.   Additionally, upon information and belief, at the time of Mr. Muhammad's second termination, a significant number of Cornerstone's employees assigned to its Cornerstone Energy Park were Black or African American.   But, upon information and belief, Cornerstone only

assigned one Black or African American employee to any management position, resulting in a statistical, disproportionately underrepresented number of Cornerstone's Black or African American employees assigned to management positions.

106.    Upon information and belief, at all times, the decisions and actions of Greg Ritter and Cornerstone management were done purposefully, within the course and scope of their duties as authorized agents of Cornerstone, and with the knowledge that their unlawful termination decisions against Mr. Muhammad were unlawful under both federal and state law.

107.    Accordingly, Cornerstone is liable for all actual and statutory damages suffered by Mr. Muhammad resulting from Cornerstone's illegal and racially motivated employment actions, including, but not limited to, lost back wages, lost front wages, reinstatement, compensatory damages, non-compensatory damages, punitive damages, mental anguish damages, loss of enjoyment of life damages, legal costs, pre-judgment interest, post-judgment interest, Mr. Muhammad's reasonable attorney's fees and actual costs incurred in this action, and all other appropriate, equitable relief.

**B.    Unlawful Disparate-Treatment Discrimination Based on Retaliation Under Title VII**

108.    Mr. Muhammad states a cause of action for disparate treatment discrimination based on retaliation against Cornerstone under Title VII.

109.    Pursuant to Title VII of the Civil Rights Act of 1964 (as amended), an employer may not discriminate against an employee "because he has opposed any practice made an unlawful employment practice under [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]. 42 U.S.C. §2000e-3(a).   In a retaliation case, "an adverse employment action is one that 'a reasonable employee would have found . . . [to be] materially adverse, which in this context means it might

well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (citing *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53 (2006)). "Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a prima facie case of retaliation." *McCoy v. City of Shreveport*, 492 F.3d 551, 562 (5th Cir. 2007) (quoting *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997)). Just as in a Title VII discrimination case, an employer remains vicariously liable for the acts of its decision-maker when the decision-maker serves as the employer's agent, or when the employer knew or should have known of the decision-maker's discriminatory conduct and took no remedial action. *See e.g.*, *Flanagan v. Aaron E. Henry Cmty. Health Servs. Ctr.*, 876 F.2d 1231, 1235 (5th Cir. 1989).

110.     In this case, upon information and belief, Mr. Muhammad made several complaints of race-based discrimination against Cornerstone management and Greg Ritter, both during Mr. Muhammad's arbitration proceedings after his first termination, and likewise directly to Cornerstone Human Resources staff during that same process and immediately after Mr. Muhammad's reinstatement. Upon information and belief, Cornerstone and its HR staff did not actually investigate Mr. Muhammad's complaints, nor did they take any action to prevent future discrimination by management or Greg Ritter against Mr. Muhammad. On April 30, 2020, less than five months after Mr. Muhammad's date of reinstatement, Cornerstone and Greg Ritter again terminated Mr. Muhammad's employment for pretextual reasons, specifically the same pretextual reason that preceded Mr. Muhammad's first termination in 2018. Upon information and belief, Greg Ritter would not have terminated Mr. Muhammad but for his prior, protected complaints of unlawful discrimination made during his prior arbitration proceedings and directly with Cornerstone human resources.

111.    Upon information and belief, at all times, the decisions and actions of Greg Ritter and Cornerstone management were done purposefully, within the course and scope of their duties as authorized agents of Cornerstone, and with the knowledge that their unlawful termination decisions against Mr. Muhammad were unlawful under both federal and state law.

112.    Accordingly, Cornerstone is liable for all actual and statutory damages suffered by Mr. Muhammad resulting from Cornerstone's illegal and retaliatory employment actions, including, but not limited to, lost back wages, lost front wages, reinstatement, compensatory damages, non-compensatory damages, punitive damages, mental anguish damages, loss of enjoyment of life damages, legal costs, pre-judgment interest, post-judgment interest, Mr. Muhammad's reasonable attorney's fees and actual costs incurred in this action, and all other appropriate, equitable relief.

**C.    Unlawful Disparate-Treatment Discrimination Based on Race, Color, and Retaliation under the Louisiana Employment Discrimination Law**

113.    Mr. Muhammad states a cause of action for unlawful disparate-treatment discrimination based on his race (African American) and color (black), as well as disparate-treatment discrimination based on retaliation, against Cornerstone under the Louisiana Employment Discrimination Law (as amended).

114.    Plaintiff hereby incorporates and re-alleges here all prior allegations in this complaint.

115.    Under the LEDL, no employer may discriminate against an employee based on his race, color, national origin, or sex.  La. Rev. Stat. Ann. § 23:332 *et seq.*  Louisiana's anti-discrimination statute is modeled after Title VII, and therefore analysis of the two statutes are functionally identical.  Likewise, under La. Rev. Stat. Ann. § 51:2256 *et seq.*, no employer may "retaliate . . . in any manner against a person because he has opposed a practice declared unlawful under [the LEDL]."

116.    Accordingly, for all the reasons stated throughout this complaint, and specifically

incorporating the analysis of plaintiff's claims of unlawful disparate treatment discrimination and retaliation under Title VII against Cornerstone, Cornerstone is likewise liable to Mr. Muhammad for all his damages arising from Cornerstone's unlawful disparate treatment discrimination and retaliation against him, including, but not limited to, lost back wages, lost front wages, reinstatement, compensatory damages, non-compensatory damages, mental anguish damages, loss of enjoyment of life damages, legal costs, pre-judgment interest, post-judgment interest, Mr. Muhammad's reasonable attorney's fees and actual costs incurred in this action, and all other appropriate, equitable relief.

**D.** **Unlawful Disparate Treatment Discrimination Based on Race and Retaliation under 42 U.S.C. § 1981 Against Cornerstone Chemical Company and Greg Ritter in his Individual Capacity**

117.    Mr. Muhammad states a cause of action for unlawful disparate-treatment discrimination based on his race (African American), color (black), and retaliation against Cornerstone and Greg Ritter in his individual capacity under 42 U.S.C. § 1981.

118.    Pursuant to Section 1981 of the Civil Rights Act of 1866 (as amended), "all persons in the United States shall have the same contractual rights as white citizens" and an employer may not discriminate against its employees on the basis of their race. *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 (5th Cir. 1996) (citing 42 U.S.C. § 1981(a)).  Whether an employer violates Section 1981 is determined under the same analysis as a Title VII claim.  *LaPierre*, 86 F.3d at 448.  In a Section 1981 action, an employer is vicariously liable for its manager's discriminatory acts when the manager serves as the employer's agent, or when the employer knew or should have known of the manager's discriminatory conduct and took no remedial action.  *Arguello v. Conoco, Inc.*, 207 F.3d 803, 807 (5th Cir. 2000).

119.    In a Section 1981 action, the individual decision-maker who purposefully engages in

racially discriminatory acts or retaliation, although not the victim's actual employer, is liable under Section 1981.  *See Johnson v. Chapel Hill Indep. Sch. Dist.*, 853 F.2d 375, 381 (5th Cir. 1988).

120.    Section 1981 likewise authorizes retaliation claims based on prior complaints of race-based discrimination in addition to substantive, race-based discrimination claims. *See e.g.*, *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 128 S. Ct. 1951, 170 L. Ed. 2d 864 (2008) (so holding).

121.    Accordingly, the framework for determining Cornerstone and Greg Ritter's liability under Section 1981 is identical to that used under Title VII.

122.    Plaintiff hereby incorporates and re-alleges here all prior allegations in this Complaint.

123.    Further, and more specifically, upon information and belief, based on all the facts and circumstances as Mr. Muhammad currently understands them, Greg Ritter was the final and actual decision maker who terminated Mr. Muhammad's employment with Cornerstone; Cornerstone either authorized or knew of Mr. Ritter's termination decision; and both Cornerstone and Mr. Ritter determined to terminate Mr. Muhammad's employment because of his race (African American), color (black), and in retaliation for his protected complaints of race discrimination made during Mr. Muhammad's prior arbitration proceedings and directly to Cornerstone human resources.  In other words, upon information and belief, and based on all the facts and circumstances as Mr. Muhammad currently understands them, Cornerstone and Mr. Ritter would not have terminated Mr. Muhammad's employment for the second time in this matter had he not been black, African American, or made prior protected complaints of race-based discrimination.

124.    Accordingly, pursuant to Section 1981 of the Civil Rights Act of 1866 (as amended) Cornerstone and Greg Ritter are jointly and severally liable for all actual and statutory damages suffered by Mr. Muhammad resulting from his discriminatory termination, including, but not limited to, lost back wages, lost front wages, reinstatement, compensatory damages, non-

compensatory damages, punitive damages, mental anguish damages, loss of enjoyment of life damages, legal costs, pre-judgment interest, post-judgment interest, Mr. Muhammad's reasonable attorney's fees and actual costs incurred in this action, and all other appropriate, equitable relief.

**E.   Unlawful Disparate-Treatment Discrimination Based on Retaliation under Louisiana's Environmental Whistleblower Statute**

125.   Mr. Muhammad states a cause of action for unlawful disparate-treatment discrimination based on retaliation against Cornerstone under La. Rev. Stat. Ann. § 30:2027 *et seq.* (hereafter the "Louisiana Environmental Whistleblower Statute," or "LEWS").

126.   Pursuant to Louisiana's Environmental Whistleblower Statute, "No firm, business, private or public corporation, . . .  shall act in a retaliatory manner against an employee, acting in good faith, who . . . [d]iscloses . . . to a supervisor . . . an activity, policy, practice of the employer . . . that the employee reasonably believes is in violation of an environmental law, rule, or regulation." La. R.S. 30:2027(A).  A plaintiff proves a prima facie case under the LEWS by proving "(1) the employee acts in good faith; (2) the employee reports, or threatens to report, a violation; (3) the employee reasonably believes the activity, policy, or practice undertaken by his employer, or another employer with whom there is a business relationship with his employer, is a violation of an environmental law; (4) the employee reports, or threatens to report, the violation to a supervisor or to a public body of the employer; and (5) employer acts in a retaliatory manner because the employee reported, or threatened to report, a violation." *Collins v. State ex rel. Dep't of Nat. Res.*, 2012-1031 (La. App. 1 Cir. 5/30/13); 118 So.3d 43, 49.  The purpose of LEWS "is to protect employees from retaliatory action or other adverse employment action by employers for reporting **possible environmental violations**." *Id.* (emphasis in original).  A plaintiff need not know the actual law or regulation violated at the time of making the protected report. *Id.*

127.   In the present case, Mr. Muhammad was at all times acting in good faith when he

complained to Cornerstone management, Greg Ritter, and other supervisors regarding what Mr. Muhammad perceived to be hazardous and unlawful practices at Cornerstone's chemical plan both concerning maintenance of the ME100 and otherwise, in violation of Louisiana and federal environmental laws and regulations.

128.    Specifically, Mr. Muhammad reasonably perceived in good faith that the ME100 had hazardous chemical improperly collected and trapped in the unit's drainage pipe which could later discharge untreated into the air or open-air waste trough.  Mr. Muhammad reasonably perceived that the ME100's drainage values had been improperly aligned such as to cause hazardous chemical to pool and collect untreated.  Mr. Muhammad reasonably perceived the plant's open-air waste trough allowed, to Mr. Muhammad's perception, the risk that hazardous chemical vapor could escape into the air or spill out.  Mr. Muhammad reasonably perceived that Cornerstone's practice of using a burlap sack to control chemical vapor discharge into the air during maintenance of the ME100 was inadequate to protect worker and environmental safety.  Mr. Muhammad reasonably believed in good faith that each of these hazardous conditions violated safety and environmental laws and regulations regarding the use, containment, and processing of hazardous chemicals and chemical waste at the plant.

129.    After perceiving these hazardous conditions and environmental violations, Mr. Muhammad complained to three separate supervisors regarding the environmental and safety hazards posed by ME100 and otherwise, including Greg Ritter, Tina Nguyen, and Stead Palahan, and requested Cornerstone assist and remedy the problems.

130.    Ultimately, upon information and belief, Cornerstone refused to act upon the complaints and in fact attempted to cover up the problem specifically posed by the condition of the ME100 by terminating Mr. Muhammad's employment for the second time in retaliation against him for

reporting what he reasonably perceived in good faith to be violations of safety and environmental law and regulations. In other words, Cornerstone would not have terminated Mr. Muhammad's employment had he not complained about what he in reasonably perceived in good faith to be violations of safety and environmental law and regulations.

131.    The LEWS provides that "[a]ny employee against whom any action is taken as a result of acting [under the LEWS] may commence a civil action in a district court of the employee's parish of domicile, and shall recover from his employer triple damages resulting from the action taken against him and all costs of preparing, filing, prosecuting, appealing, or otherwise conducting a law suit, including attorney's fees, if the court finds that [the law] has been violated. In addition, the employee shall be entitled to all other civil and criminal remedies available under any other state, federal, or local law."

132.    Accordingly, Cornerstone is liable, both directly and vicariously through its officers and employees, for all actual and statutory damages suffered by Mr. Muhammad resulting from his retaliatory termination, including, but not limited to, triple lost back wages, triple lost front wages, reinstatement, triple compensatory damages, triple non-compensatory damages, triple mental anguish damages, triple loss of enjoyment of life damages, legal costs, pre-judgment interest, post-judgment interest, Mr. Muhammad's reasonable attorney's fees and actual costs incurred in this action, and all other appropriate, equitable relief.

**JURY DEMAND**

Mr. Muhammad requests a trial by jury on all claims and causes of action asserted in this matter.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff Okula Muhammad prays that his complaint be deemed good and

sufficient; that it summons be served upon defendants Cornerstone Chemical Company and Greg Ritter, and, after due proceedings are had, that judgment be entered in favor of plaintiff and against defendants (1) declaring that defendants did intentionally discriminate and retaliate (as the case may be) against plaintiff based on his race, color, and protected complaints regarding defendant's unlawful employment misconduct, (2) awarding Mr. Muhammad legal relief with respect to his claims under Title VII, 42 U.S.C. § 1981, and Louisiana state law, up to and including lost back wages, lost future wages, compensatory damages, non-compensatory damages, statutory damages, mental anguish and loss of enjoyment of life damages, litigation costs, reasonable attorney's fees, and (for only plaintiff's federal claims under Title VII and Section 1981) punitive damages, and (for only plaintiff's state claims under the Louisiana Environmental Whistleblower Statute) trebled damages as the law allows, and pre-judgment and post-judgment interest; and (3) all other legal and equitable relief to which plaintiff may be entitled.

Respectfully submitted:

/s/ Kevin S. Vogeltanz
Kevin S. Vogeltanz, TA (Bar #32746)
The Law Office of Kevin S. Vogeltanz, LLC
823 Carroll Street, Suite A
Mandeville, LA 70448
Telephone:  (504) 275-5149
Facsimile:  (504) 910-1704
Email: vogeltanz@gmail.com

*Counsel for Okula Muhammad*

**Clerk: please hold service pending attempt at waiver of service of summons**

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**OKULA MUHAMMAD**

      **Plaintiff,**

   **v.**                                 **CIVIL NO. PENDING**

**CORNERSTONE CHEMICAL COMPANY
and GREG RITTER**

      **Defendants.**

## <u>DECLARATION OF OKULA MUHAMMAD</u>

I, Okula Muhammad, am over the age of 18 years, and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing facts and true and correct to the best of my knowledge and recollection:

1.      I am the named plaintiff in the lawsuit *Muhammad v. Cornerstone Chemical Company et al.*, soon to be filed in the United States District Court for the Eastern District of Louisiana.

2.      I authorized my attorney, Kevin S. Vogeltanz, to file the original Complaint in this matter.

3.      I verify that, at the time of its filing, each allegation of the Complaint was true and correct to the best of my knowledge and recollection.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.  Executed this March 1, 2021.

DocuSigned by:

*Okula Muhammad*

896BD429B390485...

Okula Muhammad